## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

JENNIFER PAWLACZYK,

     *Plaintiff,*                CASE NO. 1:14-CV-10983

*v.*

BESSER CREDIT UNION,      DISTRICT JUDGE THOMAS L. LUDINGTON
                                    MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.   Recommendation

Plaintiff Jennifer Pawlaczyk has brought suit against her former employer, Defendant Besser Credit Union ("Besser"), for, among other things, allegedly retaliating against her in violation of Title VII. 42 U.S.C. § 2000e-3. (Doc. 1.) After winning judgment on the pleadings on all other claims (Doc. 21), Defendant has now moved for summary judgment on this last remaining cause of action. (Doc. 24.) It argues that Plaintiff has presented no evidence establishing a prima facie discrimination case and, alternatively, that it had legitimate reasons for terminating Plaintiff. (*Id.* at 7-17.) I find Defendant's arguments persuasive and recommend GRANTING its motion for summary judgment (*Id.*).

## II.  Background

Plaintiff began working at Besser in January 2011 as an assistant manager. (Pl.'s Dep. 19:3-7, Aug. 19, 2014, ECF 24, Ex. B.) The events at issue occurred in April 2013, when Plaintiff complained about the alleged discrimination, asked for increased compensation, and was terminated. (Pl.'s Compl. 2, ECF 1; Montie Aff. 1, ECF 12, Ex. A; Pl. Letter to Besser Bd. of Directors, ECF 24, Ex. C; Besser Bd. of Directors Meeting Minutes, Apr. 16, 2013, ECF 24, Ex. D.) According to her complaint, Plaintiff's boss, Nancy Montie, who is Besser's chief executive officer ("CEO"), was reviewing employment applications that month. (Pl.'s Compl. 2.) Part of Montie's review process included placing sticky notes on the applications or writing in the margins "to identify these employees by demographics." (*Id.*) Plaintiff informed her that "such actions were inappropriate and illegal," but Montie nonetheless "expressed her interest in a lesser qualified male applicant over a more qualified female applicant based on gender." (*Id.*) Plaintiff again protested. (*Id.*) The fallout from her complaints, she asserts, was that Besser began to discriminate against her: "As a direct and proximate result of plaintiff's opposition to defendant's hiring practices . . . she was discriminated [against] in that she was not promoted to CEO and was denied an enhanced 457B pension plan that she had requested from defendant. Finally, plaintiff was terminated from [D]efendant credit union." (*Id.*)

At her deposition, Plaintiff's testimony added new details and cast doubt on the complaint's assertion. She could not recall the specific dates when the exchanges with Montie occurred, guessing that they happened prior to April. (Pl.'s Dep. 51:1-

22.) Montie's notes and marginalia on the applications were not related to any particular open position, but rather she jotted them on the applications they occasionally received. (Pl.'s Dep. 52:16-54:23.) Montie did not "see every single" application, and Plaintiff had "no idea" if Montie wrote on every one she examined. (Pl.'s Dep. 54:7-23.) Plaintiff only remembered one note, which stated, "for example, 'The cute young girl that came in.'" (Pl.'s Dep. 54:24-55:23.) Montie's handwriting was recognizable to Plaintiff, and Montie had apparently been "by the front desk when the person came in," which is how Plaintiff knew that the comments came from Montie. (Pl.'s Dep. 55:21-56:4.)

Plaintiff found the note objectionable because she thought it should not matter "whether [the applicant] is cute or young or old or, you know, blue or green . . . . You don't always know that information. It's not something that you're going to see and that you can judge people by." (Pl.'s Dep. 56:14-24.) "To say that someone is a cute young girl versus, you know, a short black man, you know, to me those are discriminatory features that would be used," she explained. (Pl.'s Dep. 60:22-61:1.) Otherwise, Plaintiff did not believe anything else about the statement was inappropriate. (Pl.'s Dep. 56:25-57:2.)

Asked for other "specifics" about the application comments allegation, Plaintiff responded that they discussed "several applications all at that one same time. So, no." (Pl.'s Dep. 58:3-6.) She could only describe the one incident regarding the female applicant. (Pl.'s Dep. 58:3-60:4.) Defendant's counsel pressed her to name "each and every situation that [she thought] there was some inappropriate remarks

put on employment applications." (Pl.'s Dep. 58:1-21.) Plaintiff said she removed other sticky notes from applications, but she did not know the details of the positions or even what the notes said: "I don't recall any longer what they said. I did not keep them. . . . I don't know what they said." (Pl.'s Dep. 58:25-59:17.) As with the note she remembered, she found these others inappropriate because "they're not a part of that application; they're not directly from the applicant." (Pl.'s Dep. 59:18-22.)

After seeing the note, Plaintiff told Montie that she "didn't feel it was right for us to write on the applications or anything like that." (Pl.'s Dep. 57:3-9.) The conversation regarding all of the notes took place at one time, after which they never discussed it again. (Pl.'s Dep. 59:25-60:6.) She could not say whether she told Montie the notes were "illegal," but she did warn that they would put Besser in a "precarious position." (Pl.'s Dep. 60:7-21.) While Plaintiff did not remember the response, she thought Montie seemed "irritated." (Pl.'s Dep. 57:10-24.)

Plaintiff's testimony also addressed Montie's alleged pressure to hire a male applicant, mentioned in the complaint. The job opening was for a part-time summer bank teller position, and Plaintiff along with a coworker, Ethel Wicks, interviewed the candidates. (Pl.'s Dep. 51:15-52:3.) Together, Plaintiff and Wicks decided whom to hire for the two open positions, and ended up selecting one male and one female applicant. (Pl.'s Dep. 52:4-10.) Prior to that, there were no other male employees in the office. (Pl.'s Dep. 52:11-15.) Montie wanted them to interview "a couple males . . . even though they had no prior experience like some of the females." (Pl.'s Dep.

4

61:7-25.) It is not clear from this testimony whether Montie knew they had less experience; indeed, the next comment suggests that she simply asked them if they had interviewed males while not inquiring about females. (Pl.'s Dep. 61:15-22.) Plaintiff also testified that Montie "was strongly encouraging us to hire a male." (Pl.'s Dep. 53:24-25.) In fact, according to Plaintiff, Montie "said she wanted to hire a male," but did not identify any particular less qualified applicant. (Pl.'s Dep. 63:1-7.) However, all the male prospects were less qualified because they lacked experience, in Plaintiff's estimation. (Pl.'s Dep. 63:8-14.)

At some point during the process, Plaintiff talked with Montie about the decision, telling her that "we couldn't talk about whether-or necessarily choose based on whether [the applicants] were male or female." (Pl.'s Dep. 64:4-10.) Montie "stay[ed] quiet" rather than respond, and instead started consulting Ms. Wicks instead. (Pl.'s Dep. 64:4-65:22.) Plaintiff testified that Ms. Wicks told her[1] Montie simply wanted "to make sure that we had interviewed the male applicants." (Pl.'s Dep. 64:23-65:5.) Montie did not screen the individual candidates, however. (Pl.'s Dep. 65:1-5.) These inquiries about their interviews were a problem to Plaintiff because "we all were given the impression that" Montie wanted to hire a male. (Pl.'s Dep. 62:8-9.)

---

[1] "[H]earsay is inadmissible in summary judgment proceedings to the same extent that is is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). This statement—what Montie told Wicks, according to what Wicks told Plaintiff—is not considered for the truth of what it asserts, Fed. R. Evid. 801; that is, whether Montie was concerned they interview males. Instead, as discussed below, the Court considers it to determine whether hearing such a statement, along with Montie's other comments and actions, would have given Plaintiff a reasonable belief that Montie was violating Title VII. This is relevant to whether Plaintiff's complaints were a protected activity, an element of her prima facie case.

Yet Plaintiff and her coworker "did the best we could in hiring" a candidate and, asked if they selected the two most qualified, she replied, "We felt that the applicants would work out well." (Pl.'s Dep. 66:16-25.) Then she backtracked on her earlier comment that the males were less qualified: "I'm not saying they all were. That's why I said—you just asked me generally or technically one individual, and I said generally." (Pl.'s Dep. 67:6-12.) So then why, if some male candidates were qualified, did Plaintiff think that "Montie was interested in a less qualified male over a more qualified female," Plaintiff was asked. (Pl.'s Dep. 67:13-15.) "Because she never asked whether or not we interviewed any females, or she never asked about any other applications except for the male applicants," was Plaintiff's response. (Pl.'s Dep. 67:16-18.)

Getting to the core matter, Plaintiff conceded that, contrary to her complaint, Montie never expressed interest in "a particular lesser qualified male candidate[.]" (Pl.'s Dep. 68:3-12.) Nor did she "indicate that a lesser qualified male had to be hired over a more qualified female[.]" (Pl.'s Dep. 68:13-15.) In fact, Plaintiff testified that she and her coworker hired the two best candidates and Montie did not interfere, "[o]nly encouraged" the selection. (Pl.'s Dep. 68:16-69:5.)

Plaintiff also testified about her failure to be promoted. Why did she think this constituted discrimination? (Pl.'s Dep. 69:20-70:7.) She did not "write that part" of the complaint, she said, explaining that "[i]t was not a matter of not promoted to, but when I was hired and I had my interview with [Montie], the position I was hired for as assistant manager, in our discussions, [sic] was to eventually, upon [Montie's]

6

retirement at some point in time, become the CEO of Besser." (Pl.'s Dep. 70:8-13.) She admitted, however, that she was unaware of any formal succession plans for that position. (Pl.'s Dep. 70:14-18, 79:12-24.) Plaintiff came away from her initial interview with the belief that Montie would retire in a few years. (Pl.'s Dep. 78:12-24.) Besser never guaranteed she could have the position, so Plaintiff agreed it was more accurate to say she lost the opportunity to possibly obtain that job in the indefinite future. (Pl.'s Dep. 72:1-12.)

Next, Plaintiff addressed her request to Besser for a 457B pension plan. Similarly to the CEO position, Besser never assured Plaintiff she would receive this boon before she asked for it and, in fact, fired her before ever formally responding to the request. (Pl.'s Dep. 72:13-73:15.) Ultimately, Plaintiff testified that the request did not relate to her discrimination claim. (Pl.'s Dep. 73:16-74:5.) Her discrimination contentions instead centered on "what I may have gotten had I become the CEO," she said. (Pl.'s Dep. 73:16-22.)

Plaintiff's quest for the CEO position and increased benefits did, however, trigger the events culminating in her termination. At some point before April 10, 2014, Plaintiff heard that Montie had delayed her retirement plans. (Pl.'s Dep. 74:14-76:23.) There was never a definite date established, more like a "time frame" according to Plaintiff, and it was this time frame that Montie had extended. (Pl.'s Dep. 75:12-76:14.) Around the same time, Plaintiff became aware that other companies were considering new pension plans for "senior management" and executives. (Pl.'s Dep. 76:6-16.)

7

Considering the delayed retirement and the possibility of an increased pension, Plaintiff approached Montie in the break room. (Pl.'s Dep. 74:14-77:8.) She told Montie that she knew about the new retirement plans and wished they could have discussed it directly. (Pl.'s Dep. 76:18-77:8.) Due to the changed time frame, Plaintiff inquired about "putting some sort of deferred compensation plan into play for me until" Montie retired. (Pl.'s Dep. 77:1-8.) Plaintiff understood that Montie objected to this idea because Plaintiff "had not been at the credit union long enough . . . and had not earned it, because [Montie] had just gotten [a similar pension plan]" and had worked at the Union for over thirty years. (Pl.'s Dep. 77:9-16.) Plaintiff was told she could send a letter to the Board of Directors about the plan; Montie might support the plan in the future, perhaps the following year. (Pl.'s Dep. 77:9-22.)

Plaintiff drafted the letter to the Board, which the members received in early April. (Pl.'s Dep. 78:3-7; Montie Aff. 1, ECF 12, Ex. A; Pl. Letter to Besser Bd. of Directors, ECF 24, Ex. C; Besser Bd. of Directors Meeting Minutes, Apr. 16, 2013, ECF 24, Ex. D.) The letter is in the summary judgment record (Pl. Letter, ECF 24, Ex. C), and pertinent sections of it were read at the deposition. (Pl.'s Dep. 78:10-81:17.) It began by noting that "the intent of my position," at the time of her hiring interview, "was to eventually move into the role of CEO a few years down the road, as the current CEO would retire. It was noted at this time that the current CEO was not looking at one year, but a few years." (Pl.'s Letter, ECF 24, Ex. C.) After two years, Plaintiff discovered that Montie would work for at least another five. (*Id.*)

This "change[] from the path originally discussed" left her "in a regressive state moving farther away from achieving [her] . . . goals." (*Id.*)

She had let other opportunities pass, "confident in the succession layout," the letter continued. (*Id.*) But with the new circumstances, Plaintiff informed the Board that she had to "make new and/or different decisions for my career to make up for the loss of potential benefits." (*Id.*) Accordingly, she launched into her discussion of the deferred compensation plan:

> . . . . It is not uncommon in a Credit Unions [sic] succession plan to encourage an individual in an executive position to remain on board with a benefit package similar to that of the CEO in an effort to not lose that candidate to other opportunities that will not hold them back from future career successes.
>
> A 457f deferred compensation plan is designed to retain executive leadership in succession for the CEO position while confirming the future plans for the Credit Union are uninterrupted at the time of the current CEO's retirement. . . .
>
> I would like the Board of Directors to consider implementing a defined benefit plan for the executive vice president [Plaintiff's position] in an attempt to remain steady in the future goals of both the credit union and the successor CEO.

(*Id.*) Her intention, she testified, was "to look out for whatever future possibilities I had." (Pl.'s Dep. 78:19-79:4.) Though she did not want to leave Besser, she agreed that she was seeking compensation for remaining there. (Pl.'s Dep. 80:12-16.)

Montie drafted a letter to the Board in response. (Montie Letter to Board of Directors, ECF 24, Ex. E.) Nowhere does she mention Plaintiff's complaints about discriminatory hiring practices. She denies that the CEO position was ever Plaintiff's for the taking, and instead focuses on Plaintiff's grousing and her lack of

experience. (*Id.* at Pg ID 267.) Plaintiff was hired because Montie "felt she didn't want my job as soon as she got [here]" because Montie "had no desire to retire anytime soon." (*Id.*) Thus, when she hired Plaintiff, she was searching for "someone that could work with me and not someone who wanted me out as soon as they got here." (*Id.*) Applicants, including Plaintiff, were never told that they would ascend to the CEO position. (*Id.*)

Montie found Plaintiff's current requests troubling: "Now—with only completing her 2nd yr., just starting her 3rd . . . year. [sic] She expected to be in my position and because she is not, she wants additional compensation for it?" (*Id.* at Pg ID 268.) Additionally, Plaintiff's performance did not support the request. While the first year was "GREAT," Plaintiff struggled with punctuality. (*Id.*) After that, "things started going downhill." (*Id.*) Plaintiff was "never satisfied" with her salary or her autonomy at work, causing "constant turmoil" when Montie tried to address the issues. (*Id.*) She was frequently out of the office; Montie guessed "she is physically working less than 10 months out of a year." (*Id.* at Pg ID 269.) This was particularly disconcerting because, in Montie's opinion, she received "an excellent employment package," with ample benefits and a solid and increasing base salary. (*Id.* Pg ID 268-69.) Thus, Montie characterized the problem as Plaintiff's questionable work ethic. (*Id.*) She simply did not "like the multiple hands on duties" the job required and created problems by being "gone all the time . . . ." (*Id.* at Pg ID 269.) The resulting stress often overwhelmed Montie. (*Id.* at Pg ID 269-70.)

Montie also drafted the minutes from the Board meeting on April 16, 2014, in which the members discussed Plaintiff's request and her future at Besser. (Bd. Minutes, ECF 24, Ex. D.) They examined Plaintiff's hiring interview, noting the parties involved and the questions asked. (*Id.*) They concluded, "There was no indication of the [Besser Credit Union] making the offer as [Plaintiff] stated in her first paragraph of the letter." (*Id.*) That is, the offer did not include any promises or suggestions concerning the CEO position. (*Id.*) Consequently, based on "the information gathered," they decided to terminate her employment. (*Id.*) The minutes do not indicate they addressed her discrimination complaints or even knew about them.

Plaintiff testified that three Board members met with her about her termination. (Pl.'s Dep. 83:4-7.) None of Plaintiff's testimony about that meeting, or other communications with Board members, addressed her discrimination complaints. (Pl.'s Dep. 83:10-93:10.) During the meeting, one member "said the letter [she] wrote was adversarial" and she should not have gone "around the chain of command . . . ." (Pl.'s Dep. 84:1-5.) Plaintiff also mentioned that she had previously discussed with one member other matters about her "discomfort with some of the conversations that Ms. Montie and I had." (Pl.'s Dep. 86:18-87:1.) Again, however, none of these conversations concerned the discrimination complaints. (Pl.'s Dep. 87:2-95:18.) Concluding her testimony on this point, Plaintiff indicated that the basis for her retaliation cause of action was Montie's reaction to her compensation request—Montie said Plaintiff did not deserve it (Pl.'s Dep. 92:11-

18)—and Plaintiff's other complaints about misuses of petty cash. (Pl.'s Dep. 92:11-95:18.)

## III.   Law and Analysis

### A.   Summary Judgment Standards

A motion for summary judgment will be granted under Rule 56 of the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has "'the initial burden of showing the absence of a genuine issue of material fact' as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir.

1993). When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992).

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The scope of the materials a court can review at this stage, however, ultimately is cabined by evidentiary standards. The point bears noting here as Defendant has produced mostly unauthenticated exhibits to support its motion. Rule 56 allows a party to support their position on summary judgment by citing "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(B). The court can also consider any materials in the record not cited by the parties. Fed. R. Civ. P. 56(c)(3).

The screening factor, eliminating materials from consideration, comes into play if a party objects that "the material cited to support or dispute a fact cannot be

13

presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). This mostly tracks the Supreme Court's opinion in *Celotex*, in which the Court denied that "the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." 477 U.S. at 324. The evidence should be admissible but does not necessarily need to be presented in an admissible form at this point. *See Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."); *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (finding that the *Celotex* opinion allowed "*otherwise admissible* evidence to be submitted in *inadmissible form* at the summary judgment stage, though at trial it must be submitted in admissible form").

The current language represents a significant change in summary judgment procedure. *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *1 (W.D. Mich. Oct. 31, 2011) (characterizing it as a "sea change"). The former version of the Rule contained a clause that put additional requirements on a party presenting documents. The previous Rule stated, "If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit." Fed. R. Civ. P. 56(e)(1) (2009). On this basis, the Sixth Circuit consistently held that "documents presented in connection with a summary judgment motion must be authenticated." *Foreword Magazine*, 2011 WL 5169384, at *1-2. *See also Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (noting "this court's repeated emphasis that unauthenticated documents do not meet the

requirements of Rule 56(e)"); *Hoffman v. Applicators Sales and Serv., Inc.*, 439 F.3d 9, 15 (1st Cir. 2006) (noting that documents do not become part of the summary judgment record "simply because they are the products of discovery," but rather need to be authenticated); *Michigan Paytel Joint Venture v. City of Detroit*, 287 F. 3d 527, 532 n.5 (6th Cir. 2002) (noting that a memo attached as an exhibit to a motion for summary judgment could be excluded for failing to comply with Rule 56(e)); *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993) ("This court has ruled that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded."); *Robinson v. Caruso*, No. 08-14069, 2010 WL 1248100, at *4 (E.D. Mich. Feb. 26, 2010) ("Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents . . . ."), *adopted by* 2010 WL 1248029, at *1 (E.D. Mich. Mar. 25, 2010).

The status of these authorities is questionable. Courts have found that the new Rule has jettisoned the authentication requirement. As one court explained, the cases "must be read carefully . . . in light of the 2010 amendments to Rule 56, which eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated." *Foreword Magazine, Inc.*, 2011 WL 5169384, at *2; *see also Deakins v. Pack*, 957 F. Supp. 2d 703, 752 (S.D. W.V. 2013) (noting the authentication requirement has been eliminated); *Loadman Gp., L.L.C., v. Banco Popular North America*, No. 4:10cv1759, 2013 WL 1154528, at *9 (N.D. Ohio Mar. 19, 2013) ("[S]ince the 2010 amendments . . . [parties] are no longer required to attach to the affidavits copies of

15

papers referred therein."); *Smith v. MERS*, No. 10-12508, 2012 WL 1963605, at *1 n.1 (E.D. Mich. May 9, 2012) (same), *Report & Recommendation adopted by* 2012 WL 1963604, at *1 (E.D. Mich. May 31, 2012); *Akers v. Beal Bank*, 845 F. Supp. 2d 238, 243 (D. D.C. 2012) (same); *Jeffrey v. Royal Oak Police Dep't*, No. 10-10463, 2011 WL 3849417, at *2 n.1 (E.D. Mich. July 27, 2011) (same), *Report & Recommendation adopted by* 2011 WL 3799775, at *1 (E.D. Mich. Aug. 26, 2011). One court managed the overhanging precedent with the new Rule by allowing the party, who had submitted unsworn documents, to resubmit them with authenticating declarations. *Taylor v. Science Applications Intern. Corp.*, No. 3:12 C 00119, 2013 WL 1729217, at *7 n.9 (M.D. Tenn. Apr. 22, 2013).

The Advisory Committee notes indicate that the amendments were intended to remove this requirement and allow courts to examine any admissible materials in the record: the authentication clause was "omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record." Fed. R. Civ. P. 56, 2010 advisory committee's note. This reading makes sense of the text. Rule 56 does not qualify courts' ability to consider "materials in the record," including "documents." Fed. R. Civ. P. 56(c)(1), (3). Discovery materials are routinely accepted as appropriate documents to consider on summary judgment. *Bramlage v. Wells Fargo Home Mortg., Inc.*, 144 F. App'x 489, 494 (6th Cir. 2005).

But the concerns animating the authentication requirement are not ignored. One court characterized the change as taking Rule 56 from a "bright-line" rule that

16

all documents be authenticated to a "multi-step process . . . ." *Foreword Magazine*, 2011 WL 5169384, at *2. Another way to view the shift is to recognize that it simply flips the structure of the former Rule. The old threshold authentication condition has been placed, in modified form, at the back end of the process. Now, the materials come in first, if they are listed in Rule 56(c), then the court considers their admissibility when a party raises the issue.

In fact, however, the current structure is not all that different former process. Even under the prior regime, courts would not always disregard unauthenticated materials. If the opposing side did not object to such documents, courts frequently considered them, and still do after the amendments. *See, e.g., In re GOE Lima, LLC*, No. 08-35508, 2012 WL 4468520, at *1 n.1 (Bankr. N.D. Ohio Sept. 25, 2012) (considering unauthenticated documents where the other side did not object); *Powers v. Chase Bankcard Serv., Inc.,* No. 2:10-cv-332, 2012 WL 1021704, at *9 n.3 (S.D. Ohio Mar. 26, 2012) ("Chase, however, has not objected to the consideration of this evidence based on the fact that it is not sworn and any such objection is now waived."); *Thomas & King, Inc. v. Jaramillo*, No. 08-191, 2009 WL 649073, at *3 (E.D. Ky. Mar. 10, 2009) ("Evidence not meeting the requirements of Rule 56(e) 'may be considered by the district court unless the opposing party affirmatively raises the issue [of] the defect.'" (quoting *Bennett v. Univ. Hospitals of Cleveland*, 981 F. Supp. 1065 (N.D. Ohio 1997))); *In re Appalachian Finishing Works*, 244 B.R. 771, 773 n.2 (Bankr. E.D. Tenn. 2000) (considering improperly unauthenticated documents because the other side did not object to them); *Bellamy v. Roadway*

17

*Express, Inc.*, 668 F. Supp. 615, 623 n.5 (N.D. Ohio 1987) (considering improper documents where there was no objection); *see also Jackim v. Sam's East, Inc.*, 378 F. App'x 556, 564 (6th Cir. 2010) (noting that a party waives evidentiary objections to summary judgment materials by not raising them to the trial court); *Wiley v. United States*, 20 F.3d 222, (6th Cir. 1994) (noting that failure to object before the district court to materials submitted to support a position on summary judgment, any objections are waived and will be reviewed "only to avoid a gross miscarriage of justice"); *Moore*, 2 F.3d at 699 (refusing to consider the argument that the documents violated Rule 56(e) because the party did not raise the objection before the district court); *In re Batie*, 995 F.2d 85, 89 (6th Cir. 1993) (noting that even though the district court should not rely on unauthenticated documents, the lack of objection renders the error unreviewable).

Here, Defendant supports its motion with unauthenticated documents, save the deposition transcript, which has been certified. The others consist of Plaintiff's employment application, her letter to the Board, Montie's response letter to the Board, and the Board meeting minutes. (Doc. 24, Exs. A, C-E.) Whatever the status of the Sixth Circuit's precedent on the authentication requirement, the Court will consider these documents as Plaintiff has not objected to them.

## B.   Title VII Retaliation

### 1.   General Standards

Title VII reads, in relevant part, that "it shall be an unlawful practice for an employer to discriminate against any of his [or her] employees . . . because he [or

she] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3. A retaliation claim can be established by introducing either direct or circumstantial evidence. *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d. 531, 543-44 (6th Cir. 2008). "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Id.* In contrast, circumstantial evidence requires inferential steps to lead to a conclusion of retaliation. *Id.*

When a plaintiff offers only circumstantial evidence of retaliation, courts apply a modified version of the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (6th Cir. 1987). *Id.* at 544. To begin with, a plaintiff has the initial burden of establishing a prima facie case by showing "(1) he [or she] engaged in activity protected by title VII"; (2) the defendant knew about the plaintiff's exercise of the protected activity; (3) after the protected activity took place, "the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d. 714, 730 (6th Cir. 2014) (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)). If the plaintiff makes out all the elements then the burden of production shifts to the defendant to show that there was a "legitimate, non-discriminatory reason" for the adverse action. *Id.* If the defendant makes this showing, then the burden shifts back to the plaintiff "to demonstrate that [the] [d]efendants' proffered reason was not the

true reason for the employment decision." *Id.* That is, the plaintiff must demonstrate that the reason was a mere pretext.

### 2. *Arguments*

Defendant argues that Plaintiff has failed to make her prima facie case or, alternatively, that it has offered a legitimate, non-discriminatory reason for terminating her. (ECF 24 at 7-17.) First, it claims that Plaintiff did not engage in any protected activities because she could have no reasonable belief that Montie's sticky notes or comments about interviewing males violated Title VII. (*Id.* at 7-10.) Also, no evidence suggests that her termination was caused by the lone conversation with Montie about the notes or her discussions regarding the teller position interviews. (*Id.* at 10-13.) Finally, Defendant asserts that the legitimate reason for Plaintiff's firing was her

> thinly veiled demand for more compensation to keep her at the Credit Union, a 'request' which the Board did not believe was supported by her experience or performance. The Board also determined that Plaintiff's letter misrepresented conversations the Credit Union had with her when she was hired, particularly with regard to Nancy Montie's retirement plans and Plaintiff's future as CEO.

(*Id.* at 14-15.) It claims that Plaintiff cannot prove this is pretext: Defendant simply was "not willing to reward an inexperienced employee who misrepresented the circumstances of her hiring, who alluded to other opportunities, and who clearly felt that she was entitled to the CEO position . . . ." (*Id.* at 17.)

Plaintiff's response is merely a factual recitation of the events at issue, without any legal analysis or citation to Rule 56 evidence. (Doc. 29.) As a *pro se*

party, it is understandable that Plaintiff thought this would suffice. However, relying on a reconstruction of the facts is problematic. First, statements in a party's brief are not admissible and are not in Rule 56's list of evidence the Court can consider. *Caruthers v. Correctional Med. Serv., Inc.*, No. 1:10-cv-274, 2011 WL 6402278, at *2 (E.D. Mich. Dec. 21, 2011). Consequently, "[i]t is well established that statements appearing in a party's brief are not evidence." *Id.* (citing *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006). The Court therefore cannot use Plaintiff's contentions to find a factual dispute. Even if it could, Plaintiff's deposition testimony would trump any subsequent assertions that contradicted it because a party cannot create genuine disputes of fact "'sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . .'" *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006) (quoting *Cleveland v. Policy Mgm't Sys. Corp.*, 526 U.S. 795, 806 (1999)). In any case, the brief's allegations about the discrimination claim are cursory. She mentions Montie's pressure to hire a male, but quickly shifts to facts concerning the dismissed claims or general allegations about Montie's animus towards her. (Doc. 29 at Pg ID 277-83.) None of the claims add new information that would change the outcome here.

### 3.   Prima Facie Case

I suggest that Plaintiff has failed to establish her prima facie case because she has not demonstrated the necessary causal connection between her complaints of discrimination and an adverse action. First, however, I note that whether she

engaged in any protected activity, the first prima facie element, is a close issue. "Protected activity includes 'opposing any practice that the employee reasonably believes to be a violation of Title VII . . . whether or not the challenged practice ultimately is found to be unlawful.'" *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 570-71 (6th Cir. 2009) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d, 579-80 (6th Cir. 2000)). The "protected activity" can consist of "opposing" a practice by "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices . . . ." *Eddington v. Wal-Mart Stores East, L.P.*, No. 13-11947, 2014 WL 3519206, at *4 (E.D. Mich. July 16, 2014).

Plaintiff alleges two different activities that she opposed: Montie's sticky notes and other comments about candidates' appearances and her pressure to hire a male. Plaintiff has not presented sufficient evidence to show a reasonable belief that the notes and comments violated Title VII. At her deposition, she could remember a single note mentioning that the applicant was a "cute young girl" who "came in." (Pl.'s Dep. 54:24-55:23.) Plaintiff protested that it should not matter "whether she is cute or young or old . . . ." (Pl.'s Dep. 56:14-24.) This lone note—she did not retain or recall any others—could not inculcate a reasonable belief that impermissible discrimination was afoot. Title VII protects against adverse actions taken on the bases of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). It says nothing, however, about an applicant's general aesthetics; whether she was pretty or ugly is not germane to Title VII. Courts have accordingly not found that Title VII protects a person's grooming standards or an aspect of her appearance not tied to

the explicitly protected characteristics. *See, e.g., Willingham v. Macon Telegraph Publishing Co.*, 507 F.2d 1084, 1086-88 (5th Cir. 1975) (finding that an employer's hair length requirements as applied to male applicant constituted discrimination on the basis of "grooming" standards, and thus fell outside Title VII). One particularly relevant case found that comments on an applicant's hair style were permissible, especially "[i]n view of the fact that bank employees must deal with the public when on company assignment . . . ." *EEOC v. United Virginia Bank/Seaboard Nat'l*, 615 F.2d 147, 155 (4th Cir. 1979).

Moreover, Plaintiff's objection to Montie's observation that the applicant was a "young girl" is somewhat confusing. The information would likely be apparent on the application the woman submitted. And Plaintiff's problem with Montie was the pressure to hire a male, not a female; though of course, had Montie truly discriminated in favor of a female in this instance, it would be no excuse that she had impermissibly favored males in others. In any case, Plaintiff could not hold a reasonable belief that this comment violated Title VII.

Montie's alleged pressure in the hiring procees comes closer to justifying such a belief, though still falls short. The deposition testimony persuasively indicates that Montie's actions would not raise reasonable suspicions. In particular, Plaintiff's allegations about Montie's actual conduct are vague: Montie "strongly encourage[ed]" them to hire a male (Pl.'s Dep. 53:24-25; 68:16-69:5); she wanted them to interview "a couple males" (Pl.'s Dep. 61:7-25); and Plaintiff was "given the impression" that Montie sought to hire a male (Pl.'s Dep. 62:8-9). During

discussions of the issue, Plaintiff learned that Montie simply wanted them to interview males. (Pl.'s Dep. 61:15-22; 64:23-65:5.) This desire—for male interviewees—is particularly innocuous because the Plaintiff never clearly states or provides proof that Montie knew the male applicants were less qualified. (Pl.'s Dep. 53:24-65-5.) Instead, she admits that Montie did not screen the candidates. (Pl.'s Dep. 65:1-5.)

Plaintiff's testimony establishes other damning facts, eradicating any reasonable belief that Montie had discriminatory designs: Montie never identified a particular male candidate to hire who was less qualified than the females (Pl.'s Dep. 63:1-7); she never commanded Plaintiff to hire a less qualified male or expressed interest in such an applicant (Pl.'s Dep. 68:3-15); though the male applicants were generally less qualified, not all of them were (Pl.'s Dep. 67:6-12); and Plaintiff along with her coworker made the ultimate decision to hire one male and one female based on merit.[2] (Pl.'s Dep. 52:4-10; 66:16-25; 68:16-69:5.) Thus, it appears unlikely that a reasonable person reviewing this evidence would suspect that Montie had violated Title VII. Ultimately, however, whether that belief is warranted or not is irrelevant, as Plaintiff's prima facie case fails on causal grounds.

Before discussing causation, I address the adverse action element of the prima facie case. Plaintiff claims three such actions: her termination, her failure to earn a promotion to CEO, and the rejection of her increased compensation proposal.

---

[2] Plaintiff's brief puts a different spin on their decision: "We did in the end hire one male to avoid further pressure from the CEO, Nancy Montie." (Doc. 29 at Pg ID 281.) As noted, her brief does not amount to evidence. *Caruthers*, 2011 WL 6402278, at *2. Even if it was admissible, this contention could not create a material factual dispute because it contradicts her deposition testimony. *See Aerel, S.R.L.*, 448 F.3d at 907.

Though each could be an adverse action, here only the termination constitutes an adverse action. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (noting that an "adverse employment action 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, . . . or a decision causing a significant change in benefits'" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998))); *Eddington*, 2014 WL 3519206, at *5 (noting that termination is an adverse action). Plaintiff's failure to ascend in the business's hierarchy does not constitute an adverse action against her. "Failure to promote" claims are analyzed under a modified test requiring the plaintiff to prove as her prima facie case that, among other things, she "applied for and was qualified for a promotion," she "was considered for and was denied the promotion," and similarly qualified individual "who was not a member of the protected class received the job . . . ." *Weeks v. Michigan, Dep't of Cmty. Health*, 587 F. App'x 850, 855 (6th Cir. 2014). Whether Plaintiff intended to bring this type of claim, or to establish "failure to promote" as a retaliation claim, she has not shown that Defendant's acted adversely, or even acted at all. Unlike the typical "failure to promote" case, there was no open promotion, Plaintiff never formally applied, and Defendant never selected someone else to fill the position. She was not worse off, even relative to similarly qualified persons, as a result of Defendant's actions.

Similarly, the implicit rejection of her raise request was not sufficiently adverse; she has not shown that a raise was due but withheld or that her compensation somehow significantly changed as a result of Defendant's decision. *Cf.*

25

*Laster*, 746 F.3d at 727 (noting that significant changes in benefits could constitute adverse employment action). And at her deposition, Plaintiff denied that the request had anything to do with her discrimination claim. (Pl.'s Dep. 73:16-74:5.) Again, the extent of Defendant's adverse actions is not dispositive because there was an adverse action and, even so, Plaintiff's case fails on other grounds.

Plaintiff has produced no evidence establishing causation. The Supreme Court recently defined the showing necessary to satisfy causation under 42 U.S.C. § 2000e-3: "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . ." *Univ. of Texas Southwestern Med. Cent. v. Nassar*, 113 S.Ct. 2517, 2533 (2013). This is a more demanding standard than that used in a straightforward Title VII discrimination claim. *Id.* at 2526, 2533 (noting the lessened, "motivating factor" test set out in 42 U.S.C. § 2000e-2(m)). In other words, the plaintiff must prove "that the alleged adverse action of the employer would not have occurred in the absence of the employee's protected activity." *Eddington*, 2014 WL 3519206, at *9.

The Court did not discuss when the plaintiff must make this "but-for" causal showing. In one of its first cases to address the issue after *Nassar*, the Sixth Circuit cited *Nassar* in its pretext analysis, not its discussion of the plaintiff's prima facie case. *Bishop v. Ohio Dep't of Rehabilitation & Corrections*, 529 F. App'x 685, 694-96 (6th Cir. 2013). Regarding the former, the court said the plaintiff's duty to establish causation was satisfied if she proffered evidence raising "'the inference that her protected activity was the likely reason for the adversary action.'" *Id.* at 694 (*Fuhr*

*v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013) (quotation omitted)). Other cases similarly emphasize the low threshold used at the prima facie stage, calling it a "minimal" burden "'easily met.'" *EEOC v. Avery Dennison*, 104 F.3d 858, 861 (6th Cir. 1997) (quoting *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)). Nonetheless, the post-*Nassar* cases make clear that the more rigorous "but-for" standard is part of plaintiff's prima facie case. *See, e.g., Greene v. U.S. Dep't of Veterans Affairs*, —F. App'x— 2015 WL 1296203, at *3 (6th Cir. 2015) (analyzing whether the plaintiff proved "but-for" causation in her prima facie case); *Beard v. AAA of Michigan*, 593 F. App'x 447, 451 (6th Cir. 2014) (same); *Blackmon v. Eaton Corp.*, 587 F. App'x 925, 932 (6th Cir. 2014) (same); *Laster v. City of Kalamazoo*, 746 F.3d 714, 730-31 (6th Cir. 2014) (same); *Williams v. Serra Chevrolet Automotive, LLC*, 4 F. Supp. 3d 865, 868 (E.D. Mich. 2014) (same).

Here, the only evidence of causation, which Plaintiff never mentions, is the close temporal proximity between her potentially protected activities and her termination. Her complaints seem to have preceded her firing by mere weeks. (Montie Aff. 1, ECF 12, Ex. A; Pl. Letter to Besser Bd. of Directors, ECF 24, Ex. C; Besser Bd. of Directors Meeting Minutes, Apr. 16, 2013, ECF 24, Ex. D.) Temporal proximity can be "'significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation,'" the Sixth Circuit has noted. *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 525 (6th Cir. 2008)); *see*

*also Gardner v. Michigan State Univ. Bd. of Trustees*, No. 1:12-cv-1018, 2014 WL 55818, at *4 (W.D. Mich. Feb. 11, 2014).

The timing here does not suffice to show that but for her complaints, she would not have been fired. Most convincingly, there is no proof that the Board, which made the decision, had any knowledge of Plaintiff's complaints to Montie. This lack of evidence impedes any causal implications arising from the temporal proximity: if the decision-makers did not know of the protected activity, it did not cause them to take an adverse action. Under this reasoning, courts have found that a prima facie case fails where there is no proof that the decision-makers knew of the activities. *See, e.g.*, *Simpson*, 359 F. App'x at 571 (finding no causation where "Simpson failed to establish that Araque, one of the principals in deciding that Simpson should be terminated, was even aware of his complaints"). One court, facing similar circumstances, found that the evidence's failure to indicate "that the decision-makers knew about [the] . . . complaints" was fatal to the prima facie case, despite the short period between the complaints and the adverse action. *Gardner*, 2014 WL 558818, at *4. The same conclusion applies here. Nothing suggests that the Board was aware of Plaintiff's complaints, let alone considered them when firing her.

In fact, the only evidence of the Board's decision shows that other factors motivated the decision, namely Plaintiff's request for a deferred compensation plan. Montie's letter to the Board responding to Plaintiff's request did not discuss the complaints. (Montie Letter to Board of Directors, ECF 24, Ex. E.) Instead, she

provided the Board a list of reasons to reject the request and, ultimately, terminate Plaintiff. The explanation addressed the merits of Plaintiff's performance, noting her stress-inducing complaints about salary and autonomy, as well as Plaintiff's frequent absences. (*Id.* at Pg ID 268-70.) The Board meeting minutes likewise focused on her letter. (Bd. Minutes, ECF 24, Ex. D.) The Board was evidently troubled by Plaintiff's insinuations that the CEO position had been promised to her during her interview. (*Id.*) When the Board members informed her of the decision, one of them characterized the request as "adversarial," according to Plaintiff; again indicating that the letter provoked the termination. (Pl.'s Dep. 84:1-5.) Her testimony essentially concedes that the retaliation was in response to Plaintiff's compensation request and her complaints about misuse of assets, not her discrimination complaints. (Pl.'s Dep. 92:11-95:18.)

Plaintiff emphasizes that her performance reviews were good, except for missing a few events. (Doc. 29 at Pg ID 282.) Montie's Board letter admitted Plaintiff's strengths, finding however that when weighed against her weaknesses, the compensation plan should be rejected. (Montie Letter to Board of Directors, ECF 24, Ex. E.) These same considerations convinced the Board to terminate her position. (Bd. Minutes, ECF 24, Ex. D.) Plaintiff's brief also discusses at length other issues related to the dismissed claims, describing a steadily worsening relationship with Montie based on disputes completely unrelated to the discrimination complaints. (Doc. 29 at 277-83.) Under her own telling, the abundance of these other disputes overwhelms any nexus the discrimination claims

might have to the termination. If the firing was indeed retaliatory, it was not in response to any activities Title VII protects.

### 4.   *Legitimate Reasons and Pretext*

I suggest that even if Plaintiff proved her prima facie case, Defendant has offered unrebutted legitimate reasons for terminating Plaintiff. Defendant contends that it fired Plaintiff because she made a "thinly veiled demand for more compensation" and she mischaracterized statements at her interview regarding her opportunity to become CEO. (ECF 24 at 14-15.) As noted, this is well supported by the evidence, including Montie's letter and the Board meeting minutes. Even Plaintiff testified that a Board member informed her that the letter was too "adversarial." (Pl.'s Dep. 84:1-5.) Plaintiff has not provided any evidence to doubt these rationales. (Doc. 29.)

A relevant rebuttal would show these explanations are pretext to hide Defendant's retaliation. Plaintiff does note that her work record was solid (*Id.* at Pg ID 282); but Defendant considered these strengths when making its decision. (Montie Letter to Board of Directors, ECF 24, Ex. E.) The work performance would not necessarily contradict Defendant's explanation it found that Plaintiff's letter inappropriate and unwarranted. If Plaintiff could show nonetheless that the reasons given were a flimsy covering for some other purpose, she still has no evidence that the true reasons related to her discrimination complaints. Therefore, I suggest that Defendant has offered a legitimate reason, which Plaintiff has failed to show is pretext for discrimination.

### C.    Conclusion

For the reasons above, I suggest that Plaintiff has failed to establish a prima facie retaliation case. Alternatively, Defendant has offered a legitimate reason for its actions. Thus, I recommend granting Defendant's motion for summary judgment (Doc. 24).

## IV.    <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  April 13, 2015                          S/ PATRICIA T. MORRIS
                                               Patricia T. Morris
                                               United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record. A copy was also sent via First Class Mail to Jennifer Pawlaczyk at PO Box 88, Harrisville, MI 48740.

Date: April 13, 2015                           By s/Kristen Krawczyk
                                               Case Manager to Magistrate Judge Morris